520 A.2d 59

**Jack F. McCORMICK and Mary Ann McCormick, his wife, Appellants,**

**v.**

**BLUE CROSS OF WESTERN PENNSYLVANIA, Appellee.**

Superior Court of Pennsylvania.

Argued May 1, 1986.

Filed Jan. 20, 1987.

Wm. Jon McCormick, Bentleyville, for appellants.

Gerri L. Sperling, Pittsburgh, for appellee.

Before DEL SOLE, MONTEMURO and POPOVICH, JJ.

MONTEMURO, Judge:

On November 28, 1984, appellants' action for medical benefits allegedly due from appellee was tried before the Honorable Robert A. Doyle, of the Court of Common Pleas of Allegheny County, sitting without a jury. At the close of appellants' case, on appellee's motion, a compulsory non-suit was entered against appellants.

An opinion and order was filed by the court below on January 9, 1985. The court therein determined that appellee's denial of benefits was improper; nevertheless, in light of appellants' failure to demonstrate actual damages, *i.e.*, resultant out-of-pocket expenses, the court expressly "found" in appellee's favor. Both appellants and appellee filed post-trial requests for relief. Responding only to appellee's request, on March 29, 1985, the court below ordered that its January 9, 1985 opinion and order be vacated and that a *nunc pro tunc* order be substituted simply granting appellee's motion for compulsory non-suit.

■ Appellants thereafter timely reasserted their previous post-trial requests, supplementing those by noting the court's alleged violations of Pa.R.C.P. 1038(b), (c). By an order dated August 6, 1985, the court below denied appellants' motion for post-trial relief and directed the entry of judgment on the non-suit in appellee's favor. This appeal followed.*

As framed by appellants, the issue presented is:

---

* We note that judgment was not in fact entered below until September 5, 1985, *after* the filing of appellants' notice of appeal. Nevertheless, Pa.R.A.P. 905(a) provides that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." This court, by order of September 25, 1985, therefore denied appellee's motion to quash.

We further note that, although the trial court orally granted appellee's motion for nonsuit on November 28, 1984, appellants did not file their initial motion for post-trial relief until January 14, 1985. Pennsylvania Rule of Civil Procedure 227.1(c)(2) requires parties to file post-trial motions "within *ten days* after … *notice* of nonsuit or the filing of the decision or adjudication in the case of a trial without jury or equity trial." (emphasis added). If appellants received the required "notice of nonsuit" on November 28, then their motions for post-trial relief were certainly untimely. We conclude, however, that the period for seeking post-trial relief commences only when the prothonotary formally sends notice of the nonsuit, decision or adjudication to the parties. This is consistent with post-trial practice under now-rescinded Rule 1038(d), *see Dreher Twp. Bd. v. Solitron Development Co.*, 333 Pa.Super. 33, 38 n. 3, 481 A.2d 1207, 1210 n. 3 (1984); *Gibson v. Miller*, 265 Pa.Super. 597, 601 n. 3, 402 A.2d 1033, 1035 n. 3 (1979), which Rule 227.1 replaced. In this case, the ten-day period commenced, at the earliest, on January 9, 1985, when the trial court filed its written opinion and order. This was the earliest possible date

Whether an insured, under a policy of hospital insurance, must first pay his own bills before bringing an action in assumpsit against his carrier.

Appellee argued below, and the court so found, that its obligation to provide benefits, if any, was not to appellants directly but to the health care institution which furnished treatment. Therefore, in the absence of any actual out-of-pocket payments by appellants, no right of action exists. We disagree.

█ The subscription agreement at issue herein states in its preamble:

This Agreement sets forth a Blue Cross program of comprehensive hospitalization and related health care benefits. *The Subscriber will receive benefits in accordance with the terms of the Subscription Agreement* if in need of care for a condition of illness or of bodily injury and if admitted or accepted for treatment by an Approved Health Care Institution as defined in Article I of this Agreement. (emphasis added).

Further, at article VIII(B), the agreement provides: "The Benefits of this Agreement are personal and may not be assigned." Nothing in the subscription agreement can be read to require, as a condition precedent to legal action, the actual payment by the subscriber of the medical bills to be sued upon. In fact, the language of the agreement, emphasizing that language quoted above, clearly directs the appellee's obligations to subscribers personally and creates no express right of action on behalf of health care institutions independently. While convenience may dictate that the benefits be paid directly to health care providers, the legal obligation is to subscribers.

If, due to illness or bodily injury, a subscriber receives "allowable services" from an approved health care provider and appellee denies the agreed benefits, the subscriber

on which the prothonotary could have given the required "notice" that triggers the Rule 227.1(c)(2) clock. Appellants therefore filed a timely post-trial motion on January 14 and have preserved for our review the issues raised in that motion.

possesses an immediate right of action. In *Republic Bankers Life Insurance Co. v. Anglin*, 433 S.W.2d 795, 796 (Tex.Civ.App.1968), the Court of Civil Appeals of Texas stated,

> Mr. Anglin's [appellee's] entry into the hospital and reception of its services created an implied agreement between the two that Mr. Anglin would pay the reasonable and customary charges made by the hospital. This action created hospital expense which Mr. Anglin incurred and became legally liable to pay under elementary principles of contract law.

It is precisely the liability recognized in *Anglin* that confers upon appellants herein a cause of action against appellee without regard to the lack of payments made by appellants to the health care provider. *Cf. Reading Hospital v. Capital Blue Cross*, 215 Pa.Super. 91, 257 A.2d 60 (1969); *Hermitage Health and Life Insurance Co. v. Cagle*, 57 Tenn.App. 507, 420 S.W.2d 591 (1967).

Furthermore, on perhaps a more fundamental level, insurance is obtained frequently out of a fear of the financial inability to remedy an unfortunate occurrence. To affirm the decision of the court below would in effect impose the same financial inability, which prompts the procurement of insurance, as a bar to a right of action for any wrongfully withheld benefits. We are unwilling to countenance such an absurd result.

In light of the foregoing, and mindful of our standards of review on appeal from a compulsory non-suit, *see Speicher v. Reda*, 290 Pa.Super. 168, 434 A.2d 183 (1981), we reverse the order of the court below and a new trial is ordered.

Reversed and remanded. Jurisdiction is relinquished.

POPOVICH, J., files a concurring opinion.

POPOVICH, Judge, concurring:

I concur with the result reached by Judge Montemuro, but I do so by a different route.

As stated most recently by our Supreme Court in *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983), the interpretation of insurance contracts is governed by general principles of contract law, i.e., the ascertainment of the intent of the parties is to be garnered from the written agreement, with any ambiguities in the policy being construed in favor of the insured.

Application of the aforestated precepts requires the conclusion that the insured has satisfied the terms of the policy so as to entitle her to sue the insurer for its breach.

It is the insurer's position that the agreement at issue merely requires that the insured be reimbursed for monies expended by her in the securement of health care services covered under the terms of the policy of insurance. Therefore, the insurer would have us endorse the position that, absent the insured's pre-payment of the health care costs, the insured is foreclosed from suing for the failure to establish "damages". As stated by the insurer, it has not "agreed to indemnify [the insured] for medical expenses [she] *incurred.*" (Appellee's Brief at 6; emphasis added).

I would offer that the terms of the health care agreement themselves counsel against such a conclusion. Specifically, Article III. (Conditions), Paragraph J reserved to the insurer "the right to make payments to the [insured] toward expenses *incurred* for Allowed Services in accordance with the intent of and in accordance with the provision of the Subscription Agreement." (Emphasis added)

Based on the reasonable inferences to be drawn from the aforementioned paragraph, the insurer obligated itself to make payments to or on behalf of the insured by her mere *incurrence* of an *expense* with a health care provider. See *Standard Venetian Blind Co., supra.* Further, there is no stipulation anywhere in the policy that the insured has to actually pay for the services performed as a sine qua non to holding the insurer liable for payment of the cost related thereto. If this were the case, as noted quite aptly by counsel for the insured in his brief to us, the purpose for

which the insurance was purchased would be vitiated by having to, initially, come up with the monies to pay for a service for which the insurance was specifically purchased to avoid. Conjure this circumstance: A claimant incurs the cost of medical services well beyond his means to pay. Yet, despite having insurance to cover the cost of said services, under the insurer's theory he would initially have to satisfy the cost out of his own pocket. The exact reason he secured insurance was to guard against this. If he could afford to defray the cost why should he bother to pay for insurance. The circumstance is reminiscent of a "Catch 22".

Even under Paragraph G of Article VIII., the insurer restricted the insured's right to bring a suit at law or in equity for any hospitalization *expense* for services rendered within two years thereafter. Again, no mention is made to the insured's (pre)condition of *payment* for said *expenses* prior to instituting suit. From my reading of the policy as a whole, the insured need only incur an expense from a health care provider to trigger the implementation of the policy of insurance. The topic of "coverage" is resolved subsequent to the initial incursion of the liability/debt by the insured.

In only one instance does the insurer have the option to pay the insured, as compared to the health care provider, and that is when services have been performed by a "Non-Participating Health Care Institution". Article I. (Definitions), Section 1, Paragraph D.

The point to be made is that the insurer's calling for the insured's pre-payment of the hospital bill would be counter to its own policy provisions which restrict such payment to a non-participating hospital, and the health care provider at bar (Magee Women's Hospital) is not in this classification.

Lastly, if the insurer is fearful of being exposed to multiple suits and double liability from the health care provider (the two have a separate agreement establishing their relationship for reimbursement for services rendered) if the insured were to recover but did not, in turn, pay the

hospital, its recourse would be to interplead under the Pennsylvania Rules of Civil Procedure 2301 et seq.